**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO.

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | ) |
| | ) |
| **OFFICE DEPOT, INC,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**COMPLAINT**

Plaintiff Securities and Exchange Commission alleges as follows:

**I. INTRODUCTION**

1.      Office Depot violated Regulation FD in 2007 by selectively communicating to analysts that it would not meet analysts' quarterly earnings estimates for Office Depot. After a discussion between the company's Chief Executive Officer ("CEO") and then-Chief Financial Officer ("CFO"), Office Depot conducted one-on-one calls with the analysts late in the second quarter of 2007. The company did not directly tell the analysts that it would not meet their expectations; rather, this message was signaled through its references to recent public statements of comparable companies about the impact of the slowing economy on their earnings, and reminders of Office Depot's prior cautionary public statements. The analysts promptly lowered their estimates for the period.

2.      The CFO assisted in preparing the talking points for the calls. The CFO and the CEO were aware of the declining estimates while the company made the calls, and they encouraged the calls to be completed. The company also continued to make the calls despite the CFO being notified of some analysts' concerns of, among other things, the lack of public

disclosure. Six days after the calls began, Office Depot filed a Form 8-K announcing to the market, among other things, that its sales and earnings would be negatively impacted due to a continued soft economy. Prior to that Form 8-K, Office Depot's share price had significantly dropped on increased trading volume. As a result of this conduct, Office Depot violated Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Regulation FD [15 U.S.C. §§ 78m(a) and 17 C.F.R. § 243.100, *et seq*.].

3. Unrelated to the conduct above, Office Depot overstated its net earnings in its financial statements for the third quarter of 2006 through the second quarter of 2007 as a result of accounting violations. Office Depot prematurely recognized approximately $30 million in funds received from vendors in exchange for the company's merchandising and marketing efforts instead of recognizing the funds over the relevant reporting periods in a manner consistent with Generally Accepted Accounting Principles (GAAP). In November 2007, the company restated the above financials and announced a material weakness in its internal controls over financial reporting, resulting from the failure of its personnel responsible for negotiating agreements with vendors to communicate all of the relevant information to accounting personnel. As a result of this conduct, Office Depot violated Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (b)(2)(B); and 17 C.F.R. § 240.12b-20, 240.13a-1, and 240.13a-13].

## II. DEFENDANT

4. Office Depot, Inc. is a Delaware corporation headquartered in Boca Raton, Florida. Office Depot is an office products supplier. At all relevant times, Office Depot's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the New York Stock Exchange.

### III. JURISDICTION AND VENUE

5.  The Commission brings this action pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

6.  This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.  Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because many of the acts and transactions constituting violations of the Exchange Act occurred in the Southern District of Florida. Moreover, Office Depot's headquarters are located in the Southern District of Florida. Defendant, directly and indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of conduct alleged herein.

### IV. BACKGROUND

**A. Regulation FD Violation**

8.  Office Depot, as a company policy, did not offer specific quarterly earnings guidance during the relevant time period. In late 2006 and early 2007, the CEO and the CFO believed the significant earnings per share ("EPS") growth the company achieved in 2005 and early 2006 was not sustainable and set out to temper analysts' expectations.

9.  In February 2007, during a publicly broadcasted earnings conference call, the CEO and the CFO described Office Depot's business model, which contemplated mid to upper teens EPS growth over the long-term. On another public conference call in late April 2007, the company warned investors that its largest business segments were facing a softening in demand that was continuing into the second quarter.

10. Shortly following the analysts' publication of EPS estimates for Office Depot in late April (when most analysts lowered their estimates for Office Depot), the company reiterated at a publicly available investor conference in early May that its business model contemplated only mid to upper teens EPS growth over the long-term and that the company faced a softening demand environment.

11. On May 31, 2007, the CEO alerted Office Depot's board of directors and the executive committee that the company would not likely meet the analysts' consensus $0.48 EPS estimate for the second quarter and that senior management was discussing a strategy for advance communication to avoid a complete surprise to the market.

12. Office Depot did not have written Regulation FD policies or procedures at the time. The company had also never conducted any formal Regulation FD training prior to June 2007, although its general counsel had occasionally distributed guidance and updates on Regulation FD.

### Office Depot's Selective Disclosures to Analysts

13. In early June 2007, in response to the CEO's May 31, 2007 notice to the board of directors, the CFO instructed the director of investor relations and his immediate supervisor to prepare a draft press release for her review previewing certain second quarter earnings information should the company later determine to issue one. By mid June 2007, certain of the company's preliminary internal estimates forecasted up to $0.44 EPS for the quarter. The CFO and CEO were uncomfortable with issuing a press release because the company's internal estimates were incomplete at this point.

14. On June 20, 2007, ten days prior to the close of Office Depot's second quarter for 2007, the CEO and the CFO, both of whom had investor relations experience, discussed how to

encourage analysts to revisit their analysis of the company.  The CEO, in an attempt to get analysts to lower their estimates, proposed to the CFO that the company talk to the analysts and refer them to recent earnings announcements by two comparable companies that had recently publicly announced results which were impacted by the slowing economy.  The CEO further suggested that Office Depot point out on the calls what the company had said to the market in April and May 2007.  The CEO and the CFO jointly decided to adopt this approach.  The CEO believed that if the analysts looked at Office Depot again in that light, they would come to the point of view that their estimates were too high and likely would lower them.

15.     The CFO, the director of investor relations, and the director's immediate supervisor, drafted talking points based in part on the CEO's suggestions for use as a guide for the calls with analysts.  The CEO was not asked to review the talking points and did not do so.  The agreed upon talking points are set forth below.

- Haven't spoken in a while, just want to touch base.
- At beg. of Qtr we've talked about a number of head winds that we were facing this quarter including a softening economy, especially at small end.
- I think the earnings release we have seen from the likes of [Company A], [Company B], and [Company C] have been interesting.
  - On a sequential basis, [Company A] and [Company B] domestic comps were down substantially over prior quarters.
  - [Company C] mentioned economic conditions as a reason for their slowed growth.
- Some have pointed to better conditions in the second half of the year – however who knows?
- Remind you that economic model contemplates stable economic conditions – that is midteens growth

16.     On Friday, June 22, 2007, and the following Monday, June 25, 2007, the director of investor relations spoke individually with all eighteen analysts covering Office Depot and conveyed to them the information contained in the talking points.  Office Depot did not regularly initiate calls of this type to all 18 analysts covering the company.  Word of these calls quickly

5

spread among analysts, some of whom believed that Office Depot was "talking down" analysts' earnings estimates.

17. The CFO and the CEO were in communication with the director of investor relations during and after the calls. On Saturday, June 23, 2007, the CFO emailed the analysts' revised estimates to the CEO and advised that the director of investor relations had spoken to most of the company's analysts and that two had reduced their estimates. The CEO responded positively and encouraged the calls to continue so that additional analysts would lower their estimates.

18. On Monday, June 25, 2007, the CFO asked the director of investor relations' immediate supervisor whether the director of investor relations had contacted a particular analyst whose EPS estimate was the highest and had not yet been revised. Also on Monday, the CEO requested and received an update, which showed that the analysts' consensus estimate was still $0.46. With the CFO's knowledge, the CEO then commented to the director of investor relations that they still needed conversations with a few more analysts.

19. Office Depot's calls influenced many analysts to revise and lower their second quarter 2007 forecasts. By the end of the second day of the calls, fifteen of the eighteen analysts lowered their estimates, bringing the consensus estimate down from $0.48 to $0.45.

### Analyst and Investor Reaction to Calls and Calls to Institutional Investors

20. During a call on Friday, June 22, 2007, one analyst expressed concern to the director of investor relations about the lack of a press release. That same day, the director of investor relations conveyed to the CFO this concern and that one other analyst was informing his customers that he expected Office Depot's earnings to be down based on his call.

21. On Monday, June 25, 2007, the director of investor relations notified the CFO that another analyst told him that he was surprised at the lack of a press release and indicated that several of his clients were also surprised. Also, late Monday evening, the CFO instructed the director of investor relations to call the company's top twenty institutional investors and relay the same talking points to them, which he did the following day.

### Office Depot Files an 8-K

22. After the close of the market on Thursday, June 28, 2007, six days after the calls to analysts began, Office Depot filed a Form 8-K publicly disclosing, among other things, that its earnings would be "negatively impacted due to continued soft economic conditions."

### Market Reaction

23. Between Friday, June 22, 2007 (the day Office Depot began calling analysts) and June 28, 2007 (the last market close before Office Depot filed its 8-K), the company's stock dropped 7.7%. On the first day of the calls, Office Depot's stock closed at $33.49 per share. This was a decrease of 2.8% from the previous close, on trading volume of almost 7.5 million shares, which was two and half times the average volume for the remainder of that week. On the second day of calls, the stock dropped another 3.5% to $32.32 per share on trading volume of 7 million shares.

**B. Books, Records, and Internal Controls Violations**

24. Office Depot often arranges with its vendors to receive funding for its various marketing and promotional activities relating to the vendors' products, such as advertising, store displays, and product exclusivity. For example, vendors frequently pay Office Depot to place their products in prominent store locations.

7

25. Under GAAP, the funds from these agreements are recognizable during the reporting period in which Office Depot provides the marketing and promotional activities called for in the agreements. When the activities cover multiple reporting periods, the funds are to be recognized over the relevant reporting periods in a manner consistent with GAAP.

26. Between the third quarter of 2006 and the second quarter of 2007, Office Depot prematurely recognized funds from approximately 100 vendor agreements. Many of the transactions involved an email arrangement between Office Depot personnel and the vendors that were separate from, but in addition to, the original documented agreement. These supplemental agreements often included terms that bound Office Depot to some kind of future performance and thus, would have caused the recognition of these funds to be deferred into future periods.

27. The premature recognition of vendor funds inflated Office Depot's operating profit from the third quarter of 2006 through the second quarter of 2007 by a total of approximately $30 million. Office Depot's quarterly and annual financial statements during this period overstated net earnings by 1.3% to 6.7%.

28. In November 2007, Office Depot announced that it would be restating its financial statements for the third quarter of 2006 through the second quarter of 2007 due to material errors in the accounting recognition of vendor funds that should have been deferred into later periods. The company also announced having a material weakness in its internal controls over financial reporting based on the failure to ensure that complete and accurate documentation was provided to individuals responsible for the proper recognition of vendor funds.

29. The accounting errors leading to Office Depot's restatements resulted from a communication breakdown between the Office Depot personnel responsible for negotiating and executing vendor agreements (internally referred to at Office Depot as "Merchants") and the

personnel responsible for accounting for the funds. During either the negotiation or execution of vendor agreements, the Merchants often had email or other communications with the vendors that modified the terms of existing agreements. However, the Merchants often failed to provide all of the documentation to the accounting department for consideration.

## V.  CLAIMS FOR RELIEF

### COUNT I

### Office Depot Violated Section 13(a) of the Exchange Act and Regulation FD

30. The Commission repeats and realleges paragraphs 1 through 29 of its Complaint.

31. Office Depot intentionally disclosed material, nonpublic information regarding Office Depot without making simultaneous disclosure of that information to the public.

32. By reason of the foregoing, Office Depot violated Section 13(a) of the Exchange Act and Regulation FD [15 U.S.C. § 78m(a) and 17 C.F.R. § 243.100, *et seq*.].

### COUNT II

### Office Depot Violated Section 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 Thereunder

33. The Commission repeats and realleges paragraphs 1 through 29 of its Complaint.

34. Office Depot failed to file timely accurate periodic and other reports with the Commission containing required information, and failed to add additional material information necessary to make the required periodic reports or statements, in the light of the circumstances under which they are made, not misleading.

35. Office Depot also failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets, and failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial

9

statements in conformity with U.S. GAAP or any other criteria applicable to such statements.

36. By reason of the foregoing, Office Depot violated Section 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (b)(2)(B); and 17 C.F.R. § 240.12b-20, 240.13a-1, and 240.13a-13].

## VI. **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that this Court enter final judgment against Office Depot that:

A. Orders Office Depot to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

B. Grant such other and further relief as this Court deems appropriate and necessary.

Respectfully submitted,

October 21, 2010          By:     s/ Amie R. Berlin
                                  Amie R. Berlin, Esq.
                                  Senior Trial Counsel
                                  Florida Bar No. 630020
                                  Direct Dial: (305) 982-6322
                                  E-mail: berlina@sec.gov

                                  Robert K. Levenson, Esq.
                                  Regional Trial Counsel
                                  Florida Bar No. 0089771
                                  Direct Dial: (305) 982-6341
                                  E-mail: levensonr@sec.gov

                                  Steven J. Meiner
                                  Senior Counsel
                                  New York Bar No. 2785806
                                  Direct Dial: (305) 982-6336
                                  E-mail: meiners@sec.gov

                                  *Attorneys for Plaintiff*
                                  **U.S. Securities and Exchange Commission**
                                  801 Brickell Avenue, Suite 1800
                                  Miami, Florida 33131
                                  Telephone:    (305) 982-6300

Facsimile:     (305) 536-4154